PENNSYLVANIA AFL–CIO, by William GEORGE and Richard Bloomingdale, Trustees Ad Litem; and Pennsylvania Federation of Injured Workers, Inc.; and Philadelphia Area Project on Occupational Safety and Health, Petitioners,

v.

COMMONWEALTH of Pennsylvania; and Thomas J. Ridge, in his official capacity as Governor of the Commonwealth of Pennsylvania; and Johnny J. Butler, in his official capacity as Secretary of Labor and Industry of the Commonwealth of Pennsylvania, Respondents.

Commonwealth Court of Pennsylvania.

Heard Sept. 5, 1996.

Decided Sept. 16, 1996.

Publication Ordered Oct. 1, 1996.

Irwin W. Aronson, for Petitioner, AFL–CIO.

Eric B. Schnurer, for Petitioners, PA Federation of Injured Workers and Philadelphia Area Project.

Gregory E. Dunlap, for Respondents, Thomas Ridge and Johnny Butler.

John P. Krill, for Intervenors, Senators Loeper, Armstrong and Wenger.   ·

John H. Broujos, for Intervenors, Senators Belan, LaValle, Kasunic, and Tartaglione.

COLINS, President Judge.

## I.  BACKGROUND

On July 19, 1996, petitioners filed a petition for review in the nature of a complaint in equity in this Court's original jurisdiction. In the first four counts of a five-count petition for review, petitioners allege that the General Assembly violated mandatory constitutional provisions in its recent enactment of Act 57 of 1996.  Additionally, Count V of the petition for review alleges that the Committee on Rules of the House of Representatives violated the Sunshine Act[1] when it purported to report the final version of Senate Bill No. 801, which ultimately became Act 57 of 1996. Petitioners request a declaratory judgment that Act 57 was unconstitutionally or unlawfully enacted, and further request that respondents Governor Ridge and Secretary Butler be permanently enjoined from implementing provisions of Act 57.

Presently before the Court is petitioners' motion requesting that respondents be preliminarily enjoined from implementing or enforcing Act 57, pending a resolution of this matter on the merits.  We note that Act 57 was signed into law by the Governor on June 24, 1996.  Although certain of its provisions became effective immediately, the bulk of the Act took effect in sixty days, i.e., on August 23, 1996.  A hearing on the preliminary injunction was held on September 5, 1996, at which no testimony was taken.  Although the parties were unable to stipulate as to the facts relating to the enactment of Act 57, this Court can take judicial notice of the Legislative Journals, as well as the various versions of Senate Bill No. 801, the bill ultimately enacted as Act 57.

## II.  FACTS

1.  On March 21, 1995, Senate Bill No. 801, Printer's No. 850, was introduced in the Pennsylvania Senate and referred to the Senate Committee on Labor and Industry.  The original bill was entitled

> [a]n Act Amending the Act of June 2, 1915 (P.L. 762, No. 340), entitled "An act providing for the insurance of compensation

---

1.  Act of July 3, 1986, P.L. 388, *as amended,* 65 P.S. §§ 271—286.

for injuries to employes of subscribers thereto; declaring false oaths by the subscribers to be misdemeanors; and providing penalties for the violation thereof," broadening the State Workmen's Insurance Fund's permissible coverages.

2. On January 31, 1996, the Senate Committee on Labor and Industry reported an amended version of Senate Bill No. 801 to the full Senate, now bearing Printer's No. 1697. The amendments made by the Senate Committee on Labor and Industry related solely to the subject of what is known as the State Workmen's Insurance Fund Law,[2] and the title was unchanged.

3. Following two considerations by the full Senate, Senate Bill 801, Printer's No. 1697, was referred to the Senate Committee on Appropriations on February 5, 1996.

4. The Senate Committee on Appropriations further amended Senate Bill No. 801, and reported the bill, now bearing Printer's No. 1748, to the full Senate on February 7, 1996. The amendments made by the Senate Appropriations Committee related solely to the subject of the State Workmen's Insurance Fund Law and changed the title of the bill by adding to the original title "and providing for an investigation of the financial integrity and stability of the fund."

5. On February 12, 1996, the full Senate passed Senate Bill No. 801, Printer's Number 1748, by a vote of 48–0.

6. On February 16, 1996, Senate Bill No. 801, Printer's Number 1748, was referred to the Committee on Labor Relations of the House of Representatives.

7. On March 12, 1996, the House Committee on Labor Relations further amended Senate Bill No. 801 and reported the bill to the full House of Representatives as Printer's No. 1815. These amendments again were limited to the subject of the State Workmen's Insurance Fund Law. The word "and" was stricken from the language added by the Senate to the bill's original title, and the words "and making a repeal" were added to the amended title.

8. On May 1, 1996, Senate Bill No. 801, Printer's No. 1815, was passed by the House of Representatives by a vote of 197–0.

9. Following passage by the House of Representatives, Senate Bill No. 801 was returned to the Senate for concurrence in the House amendment and was referred to the Senate Committee on Rules and Executive Nominations on May 6, 1996.

10. On June 11, 1996, Senate Bill No. 801, bearing Printer's No. 2102, was amended by the Senate Committee on Rules and Executive Nominations. These amendments included substantial changes to the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, as amended, 77 P.S. §§ 1–1041.4. The title of Senate Bill No. 801 was also amended and was now stated as the following:

An Act Amending the Act of June 2, 1915 (P.L. 736, No. 338), entitled, as reenacted and amended, "An Act defining the liability of an employer to pay damages for injuries received by an employe in the course of employment; establishing an elective schedule of compensation; providing procedure for the determination of liability and compensation thereunder; and prescribing penalties," further providing for definitions, for recovery, for liability for compensation, for financial responsibility, for compensation schedules and for wages; providing for reporting; further providing for notices, for examinations, for commutation of compensation, for exclusions, for the Workmen's Compensation Appeal Board and for procedure; providing for informal conferences; further providing for processing claims, for commutation petitions, for modifications and reversals, for pleadings, for investigations, for evidence, for appeals, for costs and attorney fees, for the Pennsylvania Workers' Compensation Advisory Council and for insurance policies; providing for settlements and for collective bargaining; further providing for ratings organizations, for rating procedures and for shared liability; providing for employer association groups; further providing for safety committees, for penalties, for prosecutions and for collection of penalties; providing for limitation of ac-

---

**2.** Act of June 2, 1915, P.L. 762, as amended, 77 P.S. §§ 201–365.

tions; further providing for assessments; providing for Workers' Compensation Judges and for transfer of administrative functions; transferring provisions relating to the State Workmen's Insurance Fund; and making a repeal.

11. On June 12, 1996, Senate Bill No, 801, Printer's No. 2102, was referred to the Senate Committee on Labor and Industry, which reported the bill without further amendment on June 17, 1996.

12. On June, 17, 1996, Senate Bill No. 801 was referred to the Senate Committee on Rules and Executives Nominations, which further amended the bill and reported the bill to the full Senate as Printer's No. 2154. These amendments retained the new title of the bill.[3]

13. On June 19, 1996, Senate Bill No. 801 was passed by the Senate by a vote of 27–22.

14. On June 19, 1996, Senate Bill No. 801 was returned to the House of Representatives and referred to the House Committee on Rules. Following a meeting of that Committee, the bill was reported to the full House of Representatives as committed.

15. The House of Representatives passed Senate Bill No. 801, Printer's Number 2154, by a vote of 106–97.

16. Senate Bill No. 801, Printer's Number 2154, was signed in both the Senate and the House of Representatives on June 20, 1996.

17. Governor Ridge signed the bill into law on June 24, 1996.

### III. PRELIMINARY INJUNCTIVE RELIEF

#### 1. GENERALLY

■ Equity will grant a preliminary injunction if the petitioner's right to relief is clear, the need for relief is immediate, and the injury will be irreparable if the injunction is not granted. *Zebra v. Pittsburgh Area School District*, 449 Pa. 432, 296 A.2d 748 (1972). Because the grant of a preliminary injunction is a harsh and extraordinary remedy, it is to be granted only when and if *each* criteria has been fully and completely established. *Committee of Seventy v. Albert*, 33 Pa.Cmwlth. 44, 381 A.2d 188 (1977). We shall first examine whether petitioners' have demonstrated a clear right to relief.

### 2. THE CONSTITUTIONAL VIOLATIONS

■ In Counts I through IV of their petition for review, petitioners allege that the procedure by which Senate Bill 801 was enacted violated various constitutional provisions. Specifically, petitioners argue that enactment of Senate Bill 801 violated Article II, Section 1 and Article III, Sections 1 through 5 of the Pennsylvania Constitution. Two of these sections, Article III Sections 1 and 3 respectively, prohibit changing the original purpose of a bill and restrict the content of bills to a single subject.[4]

In *Common Cause of Pennsylvania v. Commonwealth*, 668 A.2d 190 (Pa.Cmwlth. 1995), *aff'd per curiam*, 544 Pa. 512, 677 A.2d 1206 (1996), an *en banc* panel of this Court stated that

[l]egislative enactments [are] entitled to a strong presumption of constitutionality. 1 Pa.C.S. § 1922(3); *Snider v. Thornburgh*, 496 Pa. 159, 436 A.2d 593 (1981). The courts have abstained from consideration of many perceived procedural irregularities under the enrolled bill doctrine, which, as explained in *Kilgore v. Magee*, 85 Pa. 401, 412 (1877), states that:

[W]hen a law has been passed and approved and certified in due form, it is not part of the duty of the judiciary to go behind the law as duly certified to

---

**3.** Although the Senate Committee on Rules and Executive Nominations did not purport to amend the title of the bill, we note that the title of Printer's No. 2154 appears to have added the words "for regulations" at page 1, line 25 and the words "and broadening its permissible coverages" at page 2, lines 5 and 6. These changes were retained in the final version of the bill.

**4.** Article III, Sections 2 and 4 require that bills be referred to committee and considered on three different days in each House. As we stated in *Common Cause of Pennsylvania v. Commonwealth*, 668 A.2d 190 (Pa.Cmwlth.1995), *aff'd per curiam*, 544 Pa. 512, 677 A.2d 1206 (1996), the alleged violations of these sections are dependent on a finding of a violation of Article III, Section 1 or 3.

inquire into the observance of its passage.... The presumption in favor of regularity is essential to the peace and order of the state.

*Common Cause*, 668 A.2d at 195.

We further noted in *Common Cause*, however, that "it would be a serious dereliction on our part to deliberately ignore a *clear constitutional violation*." *Id.* (quoting *Consumer Party of Pennsylvania v. Commonwealth*, 510 Pa. 158, 178, 507 A.2d 323, 333 (1986) (emphasis added)).

■ Our Supreme Court, in considering alleged single subject violations, concluded that judicial intervention is proper where "the facts are agreed upon and the question presented is whether or not a violation of a mandatory constitutional provision has occurred...." *Consumer Party of Pennsylvania*, 510 Pa. at 180, 507 A.2d at 334. We conclude that for the limited purpose of considering petitioners' application for preliminary injunctive relief, that the matter is justiciable and is properly before us.

As noted earlier, an *en banc* panel of this Court recently considered similar constitutional challenges in *Common Cause*, and concluded that the actionable violations had, in fact, occurred. The decision in *Common Cause*, however, was premised on the fact that the subject of the challenge was a General Appropriations Act, whose purpose is constitutionally defined by Article III, Section 11. We stated that

the judiciary is normally loathe to substitute its judgment for that of the legislative branch under the guise of determining whether the constitutional "purpose" of a bill has changed during. the course of its passage through the legislative process. Therefore, the legislature has broad discretion to decide in the first instance, and to subsequently modify, the "purpose" of most legislation.

*Common Cause*, 668 A.2d at 198.

■ Senate Bill 801, contrary to the General Appropriations Act at issue in *Common Cause*, is not a General Appropriations Act whose "purpose" is constitutionally defined,

but rather substantive legislation, as to which our courts have traditionally applied a much more expansive reading of the single subject clause. This is so because the "purpose" of substantive legislation is not constitutionally defined, but rather, as indicated in *Common Cause*, is normally left to the discretion of the legislature to define. An indication of how expansive this interpretation may be was illustrated by our Supreme Court in *Consumer Party*. The bill at issue in *Consumer Party* was introduced as

[a]n act amending the act of August 9, 1955 (P.L. 323, No. 130), entitled 'an act relating to counties of the third, fourth, fifth, sixth, seventh and eighth classes; amending, revising, consolidating and changing the laws relating thereto' further providing for the filling of vacancies in certain circumstances

*Consumer Party*, 510 Pa. at 164, 507 A.2d at 325.

Following passage of differing versions by both chambers of the General Assembly, the bill was sent to a Conference Committee. What emerged from that Committee was a bill with a new title, specifically

[a]n act establishing salaries and compensation of certain public officials including justices and judges of Statewide courts, judges of courts of common pleas, judge of the Philadelphia Municipal Court, judges of the Philadelphia Traffic Court, district justices and the Governor, the Lieutenant Governor, the State Treasurer, the Auditor General, the Attorney General and certain other State officers and the salary and certain expenses of the members of the General Assembly; and repealing certain inconsistent acts.

*Consumer Party*, 510 Pa. at 164, 507 A.2d at 326.

In its amended form, the bill was enacted into law and challenged on, *inter alia*, single subject grounds. Chief Justice Nix, writing for five of seven justices on the Supreme Court,[5] noted that

[t]he expansive interpretation urged by appellants would suggest that any material change in a piece of legislation during its

---

**5.** Justice Hutchinson and Justice Papadakos con-    curred in the result.

passage would cause it to be constitutionally suspect. Such an interpretation would be incompatible with the traditional legislative process. We have said that the purpose sought to be achieved by Article III, Section 1 was to put the members of the General Assembly and others interested on notice so that they may act with circumspection. *Scudder v. Smith, supra* [331 Pa. 165, 200 A. 601 (1983)]. Here the bill in final form, with a title that clearly stated its contents, was presented to each house for its consideration and adoption. Under these circumstances there is no basis for sustaining a challenge under Article III, Section 1.

*Consumer Party*, 510 Pa. at 181, 507 A.2d at 335.

█ The alleged change in subject here is much less drastic than that alleged in *Consumer Party*. Although the original version of the bill contained only amendments to the State Workmen's Insurance Fund Law, the legislature was certainly free to repeal that act and incorporate it into the Workers' Compensation Act. To conclude that such an amendment constituted a change of subject would be substituting this Court's judgment for that of the legislature, which has already determined that the "subject" of the bill is broad enough to encompass both substantive amendments to the Workers' Compensation Act as well as amendments to the law relating to the State Workmen's Insurance Fund and the incorporation of that law into the Workers' Compensation Act. Accordingly, we must conclude that petitioners have failed to show a clear right to relief as to the alleged constitutional violations of Article III, Sections 1 through 4.

Petitioners also alleged, however, that the enactment of Act 57 violated Article III, Section 5 of the Pennsylvania Constitution, a provision that was not at issue in *Common Cause*, and, indeed, never interpreted in any reported Pennsylvania decision. Article III, Section 5 provides that

[n]o amendment to bills by one House shall be concurred in by the other, except by the vote of a majority of the members elected thereto, taken by yeas and nays, and the names of those voting for and against recorded upon the journal thereof; and reports of committees of conference shall be adopted in either House only by a vote of a majority of the members elected thereto, taken by yeas and nays, and the names of those voting recorded upon the journals.

Petitioners construe this section as placing limitations on the originating chamber once an amended bill has been returned to it. Under petitioners' interpretation, following the passage of differing versions of a bill by the two chambers, the originating chamber is limited to concurring or non-concurring in the amendments made by the other chamber and may not further amend the bill. If the originating chamber concurs, the bill is passed and proceeds to the Governor. If the originating chambers votes to non-concur, petitioners argue that the bill must proceed to a conference committee.

In the present case, petitioners maintain that the June 11, 1996 amendment of the bill by the Senate Committee on Rules and Executive Nominations is prohibited by Article III, Section 5 because the Senate, as the originating chamber, was restricted to voting to concur or non-concur in the House amendments. If petitioners' argument is accepted, the action of the Senate Committee on Rules and Executive Nominations must be declared unconstitutional, thereby vitiating subsequent actions by either chamber, including final passage of Senate Bill No. 801.

Petitioners' brief presents a scholarly and persuasive argument that the two procedures mentioned in Article III, Section 5, i.e., concurrence or referral to a conference committee, are the *exclusive* procedures available to the originating chamber once differing versions of a bill have been properly enacted by the two chambers. Petitioners point to the fact that this provision, originally adopted in the Constitution of 1874, was intended to place restraints on the legislature. Petitioners further note that shortly after Pennsylvania's adoption of the Constitution of 1874, three of our sister states chose to include identical provisions in their state constitu-

tions.[6] While no Pennsylvania Court has had the occasion to interpret the language of Article III, Section 5, petitioners note that the Alabama and Colorado Supreme Courts have interpreted identical constitutional provisions and have adopted the reasoning that petitioners now urge.

Particularly persuasive is the opinion of the Supreme Court of Alabama in *Board of Revenue v. Crow*, 141 Ala. 126, 37 So. 469 (1904), where that Court, interpreting an identical provision, held the following:

> There are two ways by which one house can concur in the amendment adopted by the other; one by a yea and nay vote of concurrence; the other by adopting the report of a conference committee by yea and nay vote.

Although this statement is nearly a century old and does not expressly prohibit further amendment, the Supreme Court of Alabama has recently reaffirmed *Crow:*

> In other words, once a bill has been introduced and passed in one house and proceeds to the other house and the other house adds certain amendments, the originating house can either concur in the amendments by a majority vote entered on the journal or adopt the report of a conference committee by a yea and nay vote.

*Members of the House of Representatives, No. 352*, 1996 Ala. LEXIS 115, released for publication May 7, 1996.

The question now arises as to the weight to be given to the Alabama Supreme Court's interpretation. Our Supreme Court, in *Commonwealth v. Edmunds*, 526 Pa. 374, 390, 586 A.2d 887, 895 (1991), set forth the analysis to be used in analyzing state constitutional provisions. While *Edmunds* involved a comparison of state and federal constitutional provisions, we believe that the same factors apply equally where petitioners urge us to adopt interpretations of similar state constitutional provisions. The *Edmunds* analysis requires an examination of four factors, namely:

1) text of the Pennsylvania constitutional provision;

2) history of the provision, including Pennsylvania case-law;

3) related case-law from other states;

4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.

■ Although we acknowledge the persuasive effect of the opinions cited by petitioners, we believe that the absence of any cases from Pennsylvania courts interpreting Article III, Section 5, together with the lack of clear language in the text itself supporting petitioners' argument that concurrence or referral to a conference committee are the *exclusive* mechanisms that may be employed by the originating chamber once an amended bill is returned to it compels us to conclude that petitioners have failed to clearly establish a violation of Article III, Section 5.

Having so concluded, however, we must stress that our discussion of Article III, Section 5, is strictly limited to a determination of whether or not preliminary injunctive relief should issue. Our conclusion that it should not is not to be viewed as an *Edmunds* analysis of Article III, Section 5. Rather, such analysis is more properly left for a decision on the merits where the question, including both the history of the provision as well as the relevant policy considerations may be more fully explored and argued.

## THE SUNSHINE ACT VIOLATIONS

Initially, we must note that the alleged Sunshine Act violations are purely statutory, and hence not a "clear constitutional violation" of the type contemplated in *Consumer Party* and *Common Cause*. Accordingly, where a Sunshine Act violation is alleged after a bill has been passed and signed into law, the enrolled bill doctrine would normally operate to prevent the courts from considering the alleged irregularity.

---

6. *See* Alabama Constitution of 1875, Article IV, Section 22 (now Section 64); Colorado Constitution of 1876, Article V, Section 23, and Missouri Constitution of 1875, Article IV, Section 32 (now Section 27).

The Sunshine Act itself, however, provides a statutory remedy for violations of the Act, which are clearly applicable to committees of the General Assembly pursuant to Section 12 of the Act, 65 P.S. § 282. Such an action, being purely statutory, is limited by the statutory remedy. That remedy provides the court "may enjoin any challenged action until a judicial determination of the legality of the meeting at which the action was adopted is reached." Section 13 of the Act, 65 P.S. § 283. Should the court determine that the meeting did not comply with the Sunshine Act, the court "may in its discretion find that any or all official action taken at the meeting shall be invalid." *Id.* As to Count V, therefore, we must consider petitioners' request for preliminary injunction *not* under the general equity standards, but rather under the language of the Sunshine Act itself.

The "challenged action" at issue here occurred in the Rules Committee of the House of Representatives on June 19, 1996, and consisted of reporting Senate Bill No. 801 to the floor of the House.[7] Subsequently, the bill under consideration was enacted into law and signed by the Governor. Petitioners request this Court to preliminarily enjoin the Governor and the Secretary of Labor and Industry from implementing the provisions of Act 57 and, should this Court ultimately determine that the meeting of the House Rules Committee violated the Sunshine Act, ask the Court to declare Act 57 invalid.

In *Consumers Education and Protective Association v. Nolan,* 470 Pa. 372, 368 A.2d 675 (1977), our Supreme Court considered whether the action of the Rules and Executive Nominations Committee of the Senate in referring to the full Senate a gubernatorial nomination to the Public Utility Commission was covered by the Sunshine Act. Following an extensive review of the Act, the Supreme Court concluded that the Sunshine Act did not apply to executive nominations.

Although the holding of the Supreme Court was that the Sunshine Act did not apply to executive nominations, Justice Eagan, writing for a five-justice majority, noted the following:

> [E]ven were we to agree that the meeting in question was subject to the Sunshine Law so as to invalidate the committee vote taken, appellants provide no authority for a judicial holding that the subsequent confirmation vote, taken by the Senate as a whole as provided by the Constitution, was similarly invalid. To the contrary, cf. *Mikell v. Philadelphia School District,* 359 Pa. 113, 58 A.2d 339 (1948); *Kilgore v. Magee,* 85 Pa. 401 (1877).

*Id.* at 390, 368 A.2d at 685.

Justice Eagan further pointed to § 681(1) of Mason's Legislative Manual, which states that "[n]either the right of a committee to consider and report a bill, nor the validity of any action reported by a committee may be questioned after the house has begun its consideration of the bill or other matter reported." *Id.* at 391 n. 11, 368 A.2d at 685 n. 11.

Assuming, *arguendo,* a violation of the Sunshine Act by the House Rules Committee, it is manifestly unclear whether the

---

7. We find of interest the fact that Section 9 of the Sunshine Act, 65 P.S. § 279(e), includes a specific provision relating to committee meetings called during a session of the Senate or House of Representatives. This provision states that

> [n]otwithstanding any provision of this act to the contrary, committees may be called into session in accordance with the provisions of the Rules of the Senate or the House of Representatives and an announcement by the presiding officer of the Senate or House of Representatives. The announcement shall be made in open session of the Senate or the House of Representatives.

Rule XV.7 of the Rules of the Senate of Pennsylvania for the 1995–96 session provides that a committee meeting may be held during a session only if approval is granted by the Majority and Minority Leaders and if notice of the bills to be considered is given during session. This rule would appear to remove meetings called off the floor from the notice requirements of the Sunshine Act. To the contrary, however, Rule 45 of the Rules of the House of Representatives, as adopted January 1, 1995, seems to reimpose notice requirements on meetings called off the floor, stating in relevant part that

> [a]ny committee meeting called off the Floor of the House shall meet in a committee room. In addition to the specific provisions of this Rule 45, all provisions of the act of July 19, 1974 (P.L. 486, No. 175)[the predecessor of the current Sunshine Act] relative to notice of meetings shall be complied with.

subsequent passage by the full House of Representatives constitutes "ratification" of the action, thus "curing" the violation. *See Lawrence County v. Brenner,* 135 Pa. Cmwlth. 619, 582 A.2d 79 (1990), *petitions for allowance of appeal denied,* 527 Pa. 652 and 656, 593 A.2d 423 and 426 (1991).

■ While we do not now decide that question, which is properly reserved for the merits of this case, we believe that language of the Sunshine Act granting this Court the discretionary authority to "enjoin any challenged action" should not be exercised under the facts of this case. Petitioners allege that the Rules Committee convened a meeting *five minutes* prior to its scheduled time and prior to the arrival of members of the minority party or the public and the media. There is *no* allegation that proper notice was not given of the meeting, nor that it was not "open."

Accordingly, because it would be inappropriate to grant preliminary injunctive relief based on the alleged Sunshine Act violations and because we conclude that petitioners have failed to show a clear right to relief as to their constitutional claims, we must deny petitioners' request for preliminary injunctive relief.

### ORDER

AND NOW, this 16th day of September, 1996, following hearing on petitioners' application for preliminary injunctive relief in the above-captioned matter, said application is DENIED.